Benjamin C. DUKE *v.* STATE of Arkansas

CA CR 01-967                              72 S.W.3d 907

Court of Appeals of Arkansas
Division I
Opinion delivered May 1, 2002

264

*Bryan P. Christian,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Michael C. Angel,* Ass't Att'y Gen., for appellee.

Olly Neal, Judge. Appellant, Benjamin C. Duke, was convicted of battery in the second degree stemming from a dog attack involving his pit bulldogs. He was sentenced to three years in the Arkansas Department of Correction. On appeal, he alleges the evidence was insufficient to support his conviction. We affirm.

On June 27, 2000, the victim, Matt Schnider, was walking along Blaney Hill Road when a dog approached him from appellant's yard. The victim paused, and as he went to walk on the other side of the road, several other dogs came from appellant's yard and started barking at him. As the victim began to back away the dogs ran up and started biting him on his legs, arms, and back. He sought refuge in an old truck parked along the side of the road. As he climbed in the truck, a black and white dog bit him on the leg. Once in the truck, the victim managed to flag down a passing motorist who took him to his sister's house and then to the hospital. After undergoing surgery, the victim talked to Lieutenant Bill Milburn and Detective Chuck Townsend of the Conway Police Department. As a result of the attack, appellant was charged with battery in the second degree.

At appellant's April 25, 2001, trial, the victim described the incident as follows:

> On June 27th of 2000, I was walking down the road and saw a dog come from [appellant's house]. I was going to a [friend's] house and had to walk by the [appellant's]. I stopped as the dog looked at me and began walking on the other side of the road. When the dogs came from his yard they stopped and started barking at me. I started to walk backwards and then turned forward again. The dogs ran up to me and started biting me. I fell into the bushes on the other side of the road. The dogs were biting me on my legs, arm, and back. I couldn't feel anything at the time. I felt like I was going to die. I was in the ditch near bushes and they were still biting me.
>
> I began to move toward the truck but was pushed to the other side of the road. I was trying to get them off so I could get to the truck and one dog began to get the others off of me. A black and white one bit my leg and held on until I got to the truck. I got to the truck and slammed the door on the dog's

head a couple of times. I had trouble getting to the truck because the dogs kept jumping on me, holding on to me and pushing me to the ground. I do not know how many times I was bitten. I bled a lot.

When I got into the truck, I was hurting a lot. I started taking paper that was in the truck and covered my wounds so I wouldn't bleed as bad.

During his testimony, he was shown photographs of appellant's dogs. From the photos he identified the dogs involved in the attack. He described the first dog that approached him as brown. The victim stated that he is now afraid of dogs and that he is undergoing counseling. As a result of the attack, the victim stated that he has scars on his arms, legs, and back and that the scars sometimes bother him.

Lieutenant Bill Milburn also testified. He stated that when he arrived at the emergency room he took pictures of the victim's injuries. The photos were admitted into evidence. Milburn described the victim as looking "chewed up or mauled." After talking to the victim, Milburn went to the scene of the attack. He stated that he noticed fresh blood in the middle of the road. He followed a trail of blood over to the side of the road where the truck was parked. Milburn saw blood and flesh on the outside of the door and on the floor of the truck. Milburn also noticed prints on the outside of the door.

While at the scene, Milburn stated that he saw appellant trying to catch two dogs that were loose in his yard. He described one of the dogs as a brindle-colored dog. Appellant managed to pen the other dog, a mixed breed, only to have it jump out of the pen and run off. Milburn stated that he found several pit bulls at appellant's residence and that a white pit bull had fresh wounds on its head. Milburn testified that appellant told him the dogs had "pinned" a neighbor the day before. Milburn stated that he looked in the white dog's mouth and found no evidence of the attack. He believed that the color of the other dogs may have camouflaged any injuries, so he did not inspect them.

Milburn testified that his investigation focused on the area near appellant's home, and that there were no other dogs in the area. Milburn said he drove through the area on several occasions looking for other dogs and that he never saw dogs running loose.

Detective Chuck Townsend testified that he spoke with the victim and received an account of what happened. Townsend stated that the victim told him four dogs were involved in the attack, a brown pit bull, a white pit bull, a black and white pit bull and a light brown mixed breed. Townsend also stated that the white pit bull was sacrificed for rabies testing and that the results were negative. Townsend stated that appellant asserted that the dogs involved were not his because, if they had been, the victim would not have lived.[1]

Townsend stated that he did not consider any dogs other than appellant's because the victim indicated that the dogs had come from appellant's yard. Townsend also stated that he questioned appellant's neighbors about stray dogs in the neighborhood. Appellant's neighbors informed Townsend that appellant's dogs were often loose, but they had also seen other stray dogs.

Townsend further testified that when he went to appellant's house to pick up two dogs, he discovered that appellant had disappeared with one of the dogs. Appellant had fled to Missouri with the dog; however, he eventually turned the dog over.

Mark Roberts, age twelve, testified that he lived near appellant and that he would go by his house two to three times a week. Roberts also testified that he has had encounters with appellant's dogs. He stated that when he would ride his bike past appellant's house, the dogs would come after him growling and barking. Sometimes appellant would be there and he would call the dogs back. Roberts described the dogs as pit bulls. He stated that the dogs would always come from appellant's house. Although the dogs never bit him, Roberts stated that he is afraid of them.

---

[1] Townsend's notes indicated that appellant said "If they were my dogs, the boy would be dead, he would have never gotten away."

Patrick Worm, age fourteen, testified that he used to live by appellant and his dogs "would get after him." On one occasion, the brown and white pit bull came running after him while he was on his bike. Worm stated that he jumped off his bike and hit the dog with a rock before getting back on his bike and riding off.

Danny Carter, appellant's next-door neighbor, testified that around midnight on May 19th or 20th, 2000, two pit bulls came over and started "barking and snapping" at him while he was sitting in his front yard. Carter stated that he called out to appellant's family to come get the dogs. As he walked toward appellant's house, one of the dogs bit him on the back of the legs. Carter stated that he reported the incident to the police. Carter further testified that a week later, two white pit bulls came into his yard and began "snapping and barking" at him. When he tried to go into his house, the dogs would try to bite the back of his legs. Carter stated that he has seen appellant's dogs running loose and that they would get into the trash and eat his dog's food. Carter also stated that the dogs bit his German Shepherd and that his dog later died.

Janette Daniel, an animal-control officer, testified that animal control had contact with appellant at his old residence, located at 1720 Highway 64 West, on several occasions. The address was a regular stopping place due to the number of calls about appellant's pit bulls running loose. Daniel stated that on one occasion the brindle pit bull chased a man into a nearby business. She stated that the dog was growling and trying to bite the man. Daniel testified that on June 27, when she arrived at the scene, there was blood on the front steps of the house. While there, the white pit bull came running into the yard. Daniel stated that she was unaware appellant had moved to Blaney Hill Road because she had received no calls about the dogs being loose in the area.

Dr. Timothy Callicott, an emergency-room physician, testified that he treated the victim on June 27th. He stated that the victim had forty to sixty wounds varying from small punctures to deep muscle lacerations. Callicott described the victim as scared, upset, and in pain. He explained that in order for a laceration to reach the muscle, it must be one-half to three-quarters of an inch

deep. Callicott stated that he was unable to close the wounds in the emergency room, so a surgeon had to be called in to close some of the wounds. He explained that in a normal situation the wounds would be closed in the emergency room. Callicott further explained that a surgeon was required due to the number of wounds and their depth. Callicott also testified that the wounds appeared to be animal bites. Callicott stated that the most serious wounds were on the victim's lower legs and that there were also wounds on his lower back and arms.

Sheldon Cain testified for the defense. He testified that he lived near appellant and that on June 27th, he passed appellant's house while going to work. Cain stated that he saw several dogs in the area including a German Shepard and a beagle. Cain also stated that it was common to see dogs running loose in the neighborhood. Cain further testified that he has been around appellant's dogs before. He described the dogs as being nonaggressive, but territorial. He also stated that the dogs were allowed to run loose most of the time. Cain admitted that on one occasion the dogs charged at him when he came over to visit appellant.

Appellant admitted owning five pit bulls, a brindle bull dog, a black bull dog, a white bull dog with brown markings, a buck-skin bull dog with a black mask and a solid white bull dog. He testified that the dogs provided security on his property. He stated that he left home on the 27th at around nine and returned around twelve. He stated that when he left, most of the dogs were secure. He also stated that he showed everyone at the scene that his dogs did not have blood on them. Appellant explained that the wound on the head of the white pit bull was from the dog scratching itself. He denied washing the blood off the dogs. Appellant also stated that he had never seen his dogs bite anyone, but he had seen them growl and bark. Appellant testified that he had never seen the dogs act aggressively toward the neighborhood kids. Appellant also denied using the dogs for fighting. During his testimony, appellant accused Officer Milburn of lying about his dogs "pinning" a neighbor the day before the attack. Although he never was told how much blood was on the porch, appellant stated that the blood was from a dog tick. He also denied any knowledge of his dogs biting Carter. Appellant stated that when he arrived

home, he parked across the road in front of the truck and that he never saw any blood on the road. He further stated that he never saw any bits of flesh in the blood spots. Appellant also denied saying "if they were my dogs, the boy would be dead, and would have never gotten away."

At the conclusion of the State's case and again at the close of all the evidence, appellant made a motion for directed verdict. He alleged that the State failed to prove he recklessly caused a serious physical injury to another person by means of a deadly weapon. He also alleged there was no evidence that the victim faced a substantial risk of death, nor was there evidence that the dogs were a deadly weapon. The court denied the motions.

▮▮▮ A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Enoch v. State*, 37 Ark. App. 103, 826 S.W.2d 291 (1992). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State, and consider only that evidence which supports the verdict. *Walker v. State*, 330 Ark. 652, 955 S.W.2d 905 (1997). Evidence, whether direct or circumstantial, is sufficient to support a conviction if it is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Id.* This court does not, however, weigh the evidence presented at trial, as this is a matter for the fact-finder. *Id.* Nor will this court weigh the credibility of the witnesses. *Id.*

Appellant argues there was insufficient evidence to support the jury's determination that he committed battery in the second degree. We disagree. A person commits battery in the second degree if he "recklessly causes serious physical injury to another person by means of a deadly weapon." Ark. Code Ann. § 5-13-202 (Supp. 2001).

Appellant first asserts that the State failed to prove that he acted recklessly. A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that the circumstances exist or the results will occur. The risk must be of a nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." Ark. Code Ann. § 5-2-202(3) (Repl. 1997).

■ The evidence elicited at trial clearly shows that appellant acted recklessly. There was evidence that appellant knew his dogs had "pinned" a neighbor the day before the attack. The dogs also had a history of attacking without provocation. Accordingly, we hold that there was substantial evidence that appellant acted recklessly.

■ Appellant next asserts that the State failed to show that the victim sustained a serious physical injury. Serious physical injury is defined as "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(19) (Supp. 2001). Whether a victim has suffered serious physical injury is an issue for the jury to decide. *Brown v. State*, 347 Ark. 308, 65 S.W.3d 394 (2001). Serious physical injury has been found where the victim was struck three times with a fist, causing facial fractures and impairment of vision for about two weeks, and where the victim suffered a broken leg, fractured toe, and bruised heel and pelvis. *Enoch v. State, supra.*

■ In this case, the victim testified that he has scarring on his lower back, legs and arms. Dr. Callicott testified that the victim sustained forty to sixty wounds that varied in size and depth. Dr. Callicott explained that under normal circumstances they would close the wounds in the emergency room; however, due to the number and depth of the victim's wounds, surgery was required. In addition, graphic photos of the victim's wounds were admitted into evidence. We cannot say that the fact-finder could not reasonably infer from the evidence that the victim sustained a serious physical injury. We therefore conclude that substantial evidence to support the finding of a serious physical injury existed.

Appellant's last argument is that the State failed to establish that his dogs were a deadly weapon. The concept of a dog being a deadly weapon is a novel issue in Arkansas. A deadly weapon is defined as "anything that in the manner of its use or intended use

is capable of causing death or serious physical injury." Ark. Code Ann. § 5-1-102(4)(B) (Supp. 2001). Appellant concedes that a dog can be used or made into a deadly weapon; however, he asserts that there was no evidence that he used his dogs in a manner that could be considered deadly.

■ Appellant testified that the dogs provided security and as such they were allowed to roam at will. While roaming, the dogs had twice bitten appellant's next-door neighbor. The dogs have also chased a man into a nearby business. There was evidence that quite often when the dogs began to "snap and growl" at someone, they would only stop when appellant called them off. Appellant's dogs had a history of attacking other animals in the neighborhood. The State presented evidence that the day before the attack, the dogs had "pinned" a neighbor. The State also presented evidence that appellant asserted that if his dogs were involved the victim would not have survived the attack. Further, appellant's own witness testified that the dogs had charged him when he came to visit appellant. Based on the applicable statute, the fact-finder could reasonably infer that these dogs were used in such a manner as to constitute deadly weapons.

■ Viewing the evidence in a light most favorable to the State, we conclude that there was substantial evidence to support the appellant's conviction of battery in the second degree.

Affirmed.

HART and BIRD, JJ., agree.